JOURNAL ENTRY AND OPINION
This case is an appeal from an order of Judge Shirley Strickland Saffold that granted partial summary judgment to appellee/cross-appellant Pepper Pike Properties Limited Partnerships ("Pepper Pike") on its claim for reformation of a commercial lease and denied summary judgment to appellant/cross-appellees Robert D. Wilson, L.P.A. and Robert D. Wilson (collectively, "Wilson"). Wilson claims it was error to reform the lease based upon a unilateral mistake. Pepper Pike claims it was error not to find Wilson in default of the lease and in failing to dismiss his counterclaims. We affirm in part and reverse in part.
On April 28, 1997, Pepper Pike and Robert D. Wilson Co., L.P.A., entered into a commercial lease, personally guaranteed by Mr. Wilson, for office space at the Executive Commons office complex in Pepper Pike. In the contract, the "Premises" is defined as the actual space leased by Wilson, the Tenant and is described in an Exhibit as consisting of 730 square feet of Rentable Area. "Rentable Area" is defined as the total amount of space in the building occupied by "Landlord" Pepper Pike and all areas rentable to tenants, whether or not rented, and is quantified as 28,882 square feet of space. In addition to the agreed upon base rent, the lease provided that Wilson would absorb its share of the taxes and increased operating expenses of the Executive Commons building containing the leased space, called "Tenant's Share," as follows: "The percentage which the Rentable Area of said Premises is of the total Rentable Area of the Building, which percentage is agreed upon as being .0253%."[1]
In August 1997, Wilson wrote to Pepper Pike to complain about his electric bill, stating that he thought it excessive and asked for an explanation of how it was apportioned. On April 7, 1999, Wilson wrote Pepper Pike to contest its Tenant's Share of taxes and increased operating expenses, asserting that the percentage it used (2.53%), was one hundred times greater than the percentage contained in the 1997 lease (.0253%). Pepper Pike responded to Wilson's 1999 dispute letter by informing him that the incorrect figure of .0253% had mistakenly been inserted into his lease, but that the simple, numerical calculation of the ratio of Wilson's Premises space to total building area, as provided in the lease, verified that a 2.53% percent tax/expense increase allocation was appropriate. On May 25, 2000, Wilson again wrote Pepper Pike to dispute its Tenant's Share of increases, citing the same calculation flaw and noted that it considered the electric bills "over the past three years" to be unreasonably high. While Wilson disputed the percentage of the total increases as indicated in statements accompanying the increased rent bills sent by Pepper Pike, it did not contest any specific component of the increase in either letter.
In response to Wilson's May, 2000 letter, Pepper Pike filed a complaint on June 8, 2000, requesting a declaratory judgment that the actual percentage of increases owed by Wilson is reflected in the ratio of the leased space to rentable area of 2.53%, that the lease, by virtue of Wilson's non-payment of the disputed expenses, is in default and should be terminated, and it requested a judgment of $2,823.54, plus interest and costs, reflecting the amount it asserted was due. Wilson answered and counterclaimed, asserting that it had been overcharged for electricity expenses throughout the occupancy of his leased premises, and that the actual figures representing taxes and operating expenses were also excessive.
Both sides moved for summary judgment and the judge ruled in her journal entry:
 "[DEFENDANT]'S MOTION FOR SUMMARY JUDGMENT (FILED 1/25/01) IS DENIED. [PLAINTIFF']S MOTION FOR SUMMARY JUDGMENT (FILED 2/9/01) IS GRANTED IN PART. THE COURT FINDS THAT THE LEASE IS TO BE REFORMED TO PROVIDE THAT [DEFENDANT]'S SHARE OF RENTABLE SPACE IS 2.53% WHICH SHALL BE APPLIED RETROACTIVELY. THE COURT FURTHER FINDS THAT [DEFENDANTS] ARE NOT IN DEFAULT OF THE LEASE. [PLAINTIFF]'S MOTION FOR SUMMARY JUDGMENT IS DENIED AS TO THE COUNTERCLAIM. PARTIAL."[2]
Thereafter, the parties filed a stipulated judgment entry awarding Pepper Pike $1,800 in damages, but preserving the underlying legal issues for purposes of appeal, and both Pepper Pike and Wilson have appealed.
In its single assignment of error, Wilson asserts:
 THE TRIAL COURT ERRED WHEN IT PARTIALLY GRANTED PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENIED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN ITS JUDGMENT ENTRY FILED ON APRIL 6, 2001.
Pepper Pike asserts, on a cross-appeal:
 THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLEE'S MOTION FOR SUMMARY JUDGMENT TO THE EFFECT THAT APPELLANTS' COUNTERCLAIM SHOULD BE DISMISSED AND APPELLANTS WERE IN DEFAULT UNDER THE LEASE.
Under Civ.R. 56, summary judgment shall be entered in favor of a moving party if:
 (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.[3]
Further clarifying the burdens placed upon moving and non-moving parties, the Ohio Supreme Court stated:
 Accordingly, we hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial * * *.[4]
Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.[5] "When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."[6] The construction of written contracts is a matter of law, and the decision of a judge in construing a contract is reviewed de novo.[7]
In its motion for summary judgment, Pepper Pike asked for a reformation of the lease agreement to substitute the percentage "2.53%" for the one filled in the blank of the form-lease used by Pepper Pike of ".0253%," to which no party to the lease meant to agree. It argues that the clear language of the lease demands that Wilson be obligated to assume the percentage of his Premises rentable area in relation to that of his building, as is clearly spelled out in lease paragraph 6(B)(1)(f), quoted above, rather than the erroneously calculated percentage filled in the lease by Pepper Pike personnel. Wilson counters that the lease percentage of .0253% may have been an error, but that the error, at most, constitutes a self-imposed bad bargain for Pepper Pike.
Reformation of a contract is an equitable remedy through which an instrument is modified because a mutual mistake of the parties does not reflect their true intent.[8] Where a party seeks reformation of a contract, the intention of the parties can be discovered through parol evidence.[9] "Thus, where an action in reformation is commenced, credible testimony concerning the conduct of the parties, any course of dealing between them, and the method of handling the specific transaction in question are entitled to great weight in determining the ultimate facts; to wit, the agreement."[10] Mutual mistake must be proven by clear and convincing evidence.[11]
In the case at bar, the boiler-plate pre-printed portions of the lease at issue clearly apportion a tenant's liability for taxes and increases in expenses in terms of premises-to-total space ratios. Wilson, although it belatedly and irrelevantly attempts to challenge the accuracy of the size of the leased premises, does not dispute the figures in its lease. Mr. Wilson testified at deposition that, while certain portions of the lease were negotiated, such as an initial three-month rent-free period and changes to the personal guaranty required of him, the lease provision at issue was left unaltered. Kelly Pekoc, an employee of Pepper Pike, testified that she filled in the .0253% in the Wilson lease by mistake, and it should have been 2.53%. Finally, the similarity of the disputed numbers leads to the unavoidable conclusion that the term filled into the Wilson lease was undoubtably a mistake resulting from nothing more than either the misplacing of a decimal point or an inadvertent placement of a "%" sign. Consequently, we find that no genuine question of fact existed, that the .0253% figure inserted in the Wilson lease was unintended by any party to the agreement and, as such, reformation of the lease was proper.
Pepper Pike argued below that Wilson had waived its right to challenge either its electric bills or the complex-wide statement of taxes and increased rent expenses claimed by Pepper Pike for either 1998 or 1999, and his counterclaims should be dismissed. Wilson countered that it preserved these disputes through the various letters it had written to Pepper Pike regarding its disagreement with what it perceived to be excessive electricity charges, and its disagreement with its allotted share of taxes and operating expense charges. We agree, in part.
Paragraph 6(B)(5) of the lease states:
 "If TENANT shall dispute any item or items included by LANDLORD in determining taxes or operating expenses for the Base Year or any Comparison Year, and such dispute is not settled amicably within 30 days after any statement for Additional Rent has been rendered or after the date for settling the Additional Rent payable for any Comparison Year, as the case may be, either party may, during the 20 days next following the expiration of said 30-day period, notify the other of its election to arbitrate said dispute * * *. If TENANT shall not dispute any item or items of any such statement within 30 days after such statement has been rendered, TENANT shall be conclusively deemed to have approved such statement."
The plain wording of this section grants the tenant the right to elect to submit a dispute over a determination of taxes or operating expenses to arbitration, therefore, a tenant who chooses not to arbitrate the inclusion of item in such determination does not waive that objection. Wilson, however, did not dispute the computation or inclusion of any item or items used in determining the taxes or operating expenses of the building containing his leased space; it challenged only its share or percentage thereof and waived its ability to challenge the 1998 and 1999 assessments for such costs. Because we find this argument well taken and affirm the reformation of the lease and, because the parties agreed to award $1,800 to Pepper Pike as liquidated damages, any remaining question over the appropriate determination of liquidated damages is moot and does not require reversal or affect the partial judgment as entered. Wilson's assignment of error is overruled.
Pepper Pike claims that Wilson's challenge to its electricity costs were similarly waived and should have been dismissed. Paragraph 5 of Wilson's lease states:
 * * * The covenant and obligation of the TENANT to pay Base Rent, Additional Rent, Adjusted Rent, or other charges which TENANT is or becomes obligated to pay to LANDLORD hereunder and each component, increment and installment thereof shall be unconditional and independent of any other covenant or condition imposed on either the LANDLORD or TENANT whether under this lease, at law or in equity and shall survive the expiration or other termination of this Lease.
And paragraph 7(A)(8) states in part:
 "Electricity shall be supplied to the Premises and TENANT shall use no other current than that so supplied. The TENANT shall pay the LANDLORD for such electric current at the rate customarily charged for such service by the electric utility company providing electricity to the building as if the electricity were furnished directly by such public utility to the TENANT, said payments to be made monthly within ten (10) days after rendition of a statement therefore * * *."
Billing and paying for electricity is an item that is open to enforcement by either party, whether under the lease or at law. While Pepper Pike contends that its duty to provide Wilson with accurate bills that reflect its exclusive electrical usage is subject to time constraints, therefore, subject to common-law waiver and estoppel defense theories, this argument ignores its contractual duty to Wilson under the lease.
Wilson has no independent meter to verify how much electricity it actually used or uses and Pepper Pike has not come forward with any evidence that its charges were accurate or proper or to counter Wilson's contention that he can substantiate that counterclaim. There was no basis to dismiss Wilson's claim that Pepper Pike had overcharged him for electric service, and the trial judge made that finding.
Pepper Pike argues that because Wilson tendered only a portion of the Additional Rent charges, it was in default of the lease, it had the right to terminate the lease, and it was error to deny that part of its motion for summary judgment.
Under paragraph 17(B) of the lease,
 "Tenant agrees that if he is in arrears of the payment of rent for ten (10) days . . . tenant shall be in default hereunder * * *. In the event of any default referred to in this paragraph, the landlord may, if the landlord so elects, with or without notice of such election * * *, with or without demand, forthwith terminate this lease and the tenant's right to possession of the Premises * * *."
Wilson counters that it had always paid its base rent and other charges, other than those improperly levied, and because he was not in default, summary judgment was not appropriate.
The reformation of a contract does not create an obligation; it establishes the content of the contract as intended by the parties.[12]
Taxes and operating expenses are clearly and unambiguously defined as Additional Rent according to paragraph 6(B)(2) of the lease, and Wilson had not satisfied its obligation to Pepper Pike for either 1998 or 1999. Given the reformation of the lease, it was in default for the arrearage; however, the judge expressly found that Wilson was not in default of the lease. Perhaps the inconsistency contained in the judgment entry was an attempt to equate default with forfeiture.
In deciding whether to award a forfeiture or termination of a lease, a judge weighs the equities of the case and the interests of the parties in arriving at a decision, even where a party is (or was) in default of a lease.[13] Equity abhors a forfeiture, and a judge is reviewed under an abuse of discretion standard in making a decision over whether a forfeiture is appropriate.[14] "An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable.[15] * * * However, when applying an abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court but must be guided by a presumption that the findings of the trial court are correct."[16] In order for there to be an abuse of discretion, "the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * *"[17]
"[A] forfeiture clause in a lease must be strictly construed and that forfeiture should not be decreed in the absence of an express stipulation in the parties' lease agreement."[18] But Ohio law clearly recognizes that forfeiture may be enforced on specified conditions.[19] Thus, when parties enter into a commercial lease from equal bargaining positions and the lease expressly authorizes forfeiture upon the occurrence of default, the courts are bound to enforce such a provision."[20]
In the case sub judice, while the journal entry may be evidence that the judge balanced the equities of terminating Wilson's lease against those of refusing to enforce a clear, unambiguous forfeiture clause in a lease between two commercially sophisticated parties, there is nothing in the record to support that presumption. Pepper Pike's assignment of error is well taken in part. We remand for such a determination of whether the termination-for-default clause in the lease should be given effect.
Judgment affirmed in part, reversed in part and remanded.
It is ordered that the parties share equally the costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA ANN BLACKMON, J., CONCUR; MICHAEL J. CORRIGAN, P.J., CONCURS INJUDGMENT ONLY.
[1] It is undisputed that the percentage of Wilson's Premises rentable area, divided by the overall Rentable Area as defined in the lease (730/28,880) yields a percentage of 2.53%.
[2] VOL. 2581, PG. 0569.
[3] Welco Industries v. Applied Companies (1993), 67 Ohio St.3d 344,346, 617 N.E.2d 1129, 1142; See, also, Zivich v. Mentor Soccer Club,Inc. (1998), 82 Ohio St.3d 367, 370; 696 N.E.2d 201.
[4] Dresher v. Burt, (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264,274.
[5] Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130,509 N.E.2d 411, paragraph one of the syllabus; Aultman Hosp. Assn. v.Community Mut. Ins. Co. (1989), 46 Ohio St.3d 51, 544 N.E.2d 920, syllabus.
[6] Shifrin v. Forest City Enterprises (1992), 64 Ohio St.3d 635,638, 597 N.E.2d 499, 501. Internal citations omitted.
[7] Long Beach Assoc., Inc. v. Pryka (1998), 82 Ohio St.3d 574,576, 697 N.E.2d 208, 209.
[8] Mason v. Swartz (1991), 76 Ohio App.3d 43, 50, 600 N.E.2d 1211, citing Greenfield v. Aetna Casualty Co. (1944), 75 Ohio App. 122, 128,61 N.E.2d 226.
[9] Mason v. Swartz, supra; See, also, Williams Trucking, Inc.v. Gable (June 8, 2000), Cuyahoga App. No. 75614, unreported.
[10] Castle v. Daniels (1984), 16 Ohio App.3d 209, 212; 475 N.E.2d 149,152.
[11] Id.
[12] Delfino v. Paul Davies Chevrolet, Inc. (1965), 2 Ohio St.2d 282,209 N.E.2d 194.
[13] See Joseph J. Freed Assoc., Inc. v. Cassinelli Apparel Corp. (1986), 23 Ohio St.3d 94, 96, 491 N.E.2d 1109, 1111.
[14] Id.
[15] Blakemore v. Blakemore, supra.
[16] Focke v. Focke (1992), 83 Ohio App.3d 552, 615 N.E.2d 327.
[17] State v. Jenkins (1984), 15 Ohio St.3d 164, 222,473 N.E.2d 264.
[18] See Layne v. Baker (1949), 86 Ohio App. 293, 91 N.E.2d 539;Fairbanks v. Power Oil Co. of Ohio (1945), 81 Ohio App. 116,77 N.E.2d 499.
[19] Ralston Steel Car Co. v. Ralston (1925), 112 Ohio St. 306,147 N.E. 513, syllabus at para. 1; Quill v. R.A. Investment Corp.(1997), 124 Ohio App.3d 653, 707 N.E.2d 35.
[20] See Equity Inns Partnership, L.P. v. Yun (Oct. 28, 1999), Cuyahoga App. No. 74160, unreported.